35741. GREAT AMERICAN INDEMNITY COMPANY *et al.*
*v.* OVERTON.

Decided June 15, 1955.

*T. J. Long, Ben Weinberg, Jr.,* for plaintiffs in error.
*John F. Cannon, Sr.,* contra.

GARDNER, P. J. The defendants contend that the facts found by the single director do not support the order or decree appealed from, and that there is not sufficient and competent evidence in the record to warrant the rendition of said award, and that the award is contrary to law. It appears to us that the findings of fact and the award of able deputy director D. C. Chalker embrace all angles of which complaint is made before the Court of Appeals. That decision reads: "This case came on to be heard before the undersigned in Atlanta, Georgia, on February 25, 1954, to determine liability, compensation, and dependency.

"Mr. Long, attorney for the defendant, stipulated that on an average of 13 weeks, immediately preceding August 22, 1953, that the employee received a weekly wage more than $48.90 and that on August 22nd he was an employee of Foote & Davies.

"Mrs. James Claude Overton, being duly sworn, testified in her own behalf in substance as follows: That she was the widow of James Claude Overton, they were married in Huntsville, Madison County, Alabama, in 1914; that she had never filed divorce action and that they were living together on August 22nd and 23rd, 1953; that their children were all grown and married, over 18 years of age; that her husband went to work on August 22nd and that she was called sometime after 12:00 o'clock and told that he was sick; that she and her grandson-in-law went after her husband and three or four men brought him out in a chair; that he couldn't do anything; that he was just like he was dead, he was wringing wet and they carried him to Grady Hospital; that they examined him there and kept him for several hours and then they took him to Emory; that he never recovered from this illness and he died on the next day, August 23rd, on Sunday night about 11:00 o'clock. That her husband did not have any children by any former marriage.

"Another hearing was held in the above case before the undersigned in Atlanta, Georgia, on May 17th, 1954 to take additional testimony.

"Dr. Abner Golden, being duly sworn, testified in substance as follows: That he was present when the autopsy was performed on the body of James Overton and that he had a copy of this autopsy report; that the cause of death of this man was a rupture of the aorta, which is the major artery of the body; that there was an underlying enlargement of the aorta and this abnormality had been present for a considerable period of time, but that the rupture, leading to the hemorrhage was an acute process; that the other contributory causes of death included those you would expect in someone who had elevated blood pressure over a period of time, namely marked enlargement of the heart, about twice the normal size and changes in the small blood vessels of the body. In addition, this individual had a fairly advanced cirrhosis of the liver, but was apparently having no clinical symptoms referable to this condition; that the cause of a rupture of a diseased

aorta such as this one could be one of three things: (1) spontane-ously without any apparent cause, (2) in association with a further rise in blood pressure, or (3) trauma. These would be the major causes of rupture; that strenuous mental concern or mental activity might lead to a further elevation of blood pres-sure; that it did in some individuals and not in others; that ordi-nary physical exertion in some individuals might further raise the blood pressure and might also contribute possibly to such a rupture; that mental or physical strain had been present in sev-eral cases of death he had observed, but in the majority of cases perhaps not; that the rupture was the clear-cut cause of death of one James Overton; that in view of the continuity of hemorrhage from the ruptured vessel all the way around to the umbilical region, he would say that the discoloration found around the umbilicus region was due to rupture.

"On cross-examination, witness further testified that there were no external evidences that this man received any trauma or blows or licks to his body and it was definitely his opinion that he did not receive any blows or licks or trauma to his body, after exam-ining him. That he could have received an external blow which would have injured internal organs and this could have affected the cause of death.

"C. L. Overton, being duly sworn, testified in substance as follows: That he was by occupation operator of a linotype ma-chine; that this work was mentally strenuous and at times it required physical strain; that the average work week was 7½ hours a day, 5 days a week but that quite often now there was a shortage of operators and most of them did work quite a bit of overtime; that he was superintendent of a printing plant and had been in charge of men for a number of years and he had observed that overtime work created a nervous condition; that he worked with James Overton a number of years, he ran a machine side by side with him; that he was recognized as tops in Atlanta as an operator; that he worked until he couldn't work any more, more hours than hardly any man in Atlanta should; that it brought on a drinking condition; that he loved his work, worked all the time and his only relaxation was taking a drink which he did quite often.

"Joseph H. Burke, being duly sworn, testified in substance as

follows: That he was comptroller at Foote & Davies and he had no knowledge of the conditions or circumstances surrounding the death of Mr. James Overton; that he knew he was a linotype operator and that was all; that according to their record the last date they paid him was on August 21, 1953; that he put in quite a bit of overtime the few weeks prior to his death; but he did not consider this abnormal and that he was making $108.12 per week straight time.

"On cross-examination, witness further stated that as far as he could determine the overtime work was at the employee's own selection and not compulsory; that he could not state what the attitude of the company would be toward an employee who refused to work overtime.

"Dr. T. E. McGheay, being duly sworn, testified in substance as follows: That he treated Mr. James Overton on the date which the hospital record indicates and that this was his last illness and that he was a patient at Emory University Hospital; that an examination was made with the purpose of affecting some treatment if possible; that Mr. Overton was complaining of terrific pain in his back and side and mainly in his left abdomen. That they found a mass in the left abdomen that seemed to pulsate slightly when his heart would beat; that he had ecchymoses, that is blood under the skin around in the left flank and all the way around to the navel in front; that he was in shock, that is low blood pressure and rapid pulse and that was about all the significant findings; that these were enough findings to lead them to make a diagnosis of a ruptured abdominal aorta; that several hours before he had a rather sudden onset of this pain in his back and in his flank with apparent collapse, employee stated that he had been working pretty hard recently and carrying some type things, which he wasn't used to carrying. After a half-hour or hour of this pain, the pain had gotten worse and worse, he collapsed and was taken, first to Grady Hospital, and then they called him as their family doctor and he got him in Emory; that Mr. Overton died in about 48 hours after he was admitted; that he had treated this family for a number of years; that Mr. Overton never would go to a doctor much, he did not recall that he ever treated him before, but if he had it was irrelevant and was 10 or 15 years before; that he read the autopsy report and con-

curred in the clinical description as made by this autopsy, but he was not present when the autopsy was made; that his opinion, from seeing the employee at the initial time and subsequent course of events as he was in the hospital leading up to his death, was that he had a ruptured abdominal aorta; that any stress and strain, anything that would elevate his blood pressure either permanently or temporarily, an increase in the pressure inside of this blood vessel, would tend to hasten the rupture of it; that if the man was under stress and strain and if he did extra lifting and picking up and carrying extra heavy stuff and he had a weakened abdominal aorta, it would certainly hasten its rupture; that Mr. Overton stated he had been carrying some kind of trays of type, which he said they didn't usually do, and based on his opinion, the carrying of heavy things hastened the rupture of his abdominal aorta, he had no proof, however, other than the patient's statement.

"J. H. Sosebee, being duly sworn, testified by deposition on May 27th, 1954, in Atlanta, Georgia, in substance as follows: That he was treasurer for Foote & Davies and that when they have an accident he makes the report to the insurance company; that he had to get the information from the particular foreman or superintendent; that he sent them an insurance form blank, they went to the party and got all the information, gave it to him and he in turn copied it on the typewriter, because he had to furnish the insurance company some three or four copies; that he did not recall making a report on the incident claimed in this case and would have to look back in the record; that he took their words as being facts and copied it down and signed it; that he did not see Mr. Overton the day he was taken ill, that he just heard afterwards that Mr. Overton was taken sick that morning and his people had come for him; that Mr. Brooks was superintendent over all of them, but Mr. Lemmon was Mr. Overton's foreman at the time. That he did not know anything about the conditions under which Mr. Overton worked, that he knew he was one of the line operators and that was about all.

"M. S. Brooks, being duly sworn, testified in behalf of the claimant by deposition in Atlanta, Georgia on May 27, 1954, in substance as follows: That he was superintendent of the Foote & Davies plant and James Overton was under his general supervision

and that he was at work at the plant the morning Mr. Overton became sick; that he received a report from another person that Mr. Overton was sick and he went back to see if there was anything he could do to help him; that Mr. Overton told him there was nothing he could do, that someone had called his family and they were coming to get him; that his foreman was not on the job then; that Mr. Overton acted as a sub-foreman in the absence of Mr. Lemmon; that he stayed there with him about 15 minutes and Mr. Overton was very pale and that he was not sure as to the time he left the plant, but it was somewhere in the vicinity of noontime; that Mr. Overton was not able to conduct himself to the car; that two people assisted him, they had to lift him entirely and placed him in the automobile; that he did not render any first aid to him, but he asked the employee to let him call a doctor and he said no; that at the time he was stricken, Mr. Overton was performing his duties as usual and he was not performing any additional duties; that prior to the time he was stricken Mr. Overton had been working some overtime; that Mr. Overton had been complaining for sometime of not feeling too well and that after he was taken away that he had no further knowledge of what happened, other than what he heard; that he could only say the man was sick that morning and as to what caused it he would not be able to say; that he did not think it was necessary for Mr. Overton to do any lifting on the particular morning when he was taken ill, but he did not know for sure; that Mr. Overton had worked for Foote & Davies about six years and that it was his opinion that he did not have to remove a magazine that morning; that he asked Mr. Overton what was wrong, he told him he was sick to his stomach, that he did not tell him he had strained or hurt himself; that he would not say it was impossible that employee strained himself, but he would say it was highly improbable doing the class of work he was doing; that a linotype operator had to have a high type of intelligence; that he recalled on one occasion that he had a discussion with Mr. Overton and told him if he did not feel well to go home.

"Floyd L. Lutz, being duly sworn, testified by deposition in Atlanta, Georgia on May 27th, 1954, in substance as follows: That he was a linotype operator for Foote & Davies, that he knew James Overton and that he worked at a machine next to

his; that on the day Mr. Overton was taken sick he did not lift any magazines or trays that contained type, to his knowledge; that he put the magazine in place for him on Friday night; that the two or three weeks prior to that time Mr. Overton requested him to change the magazine for him and he would do it; that he stated he was simply too weak to change them; that when he noticed Mr. Overton was disabled was during the lunch period and he was coming from the restroom, that he was paler than he had been ever before, he was barely moving, dragging his feet and holding onto things as he came down the passageway; that he had a half hour off for lunch that day and he believed it occurred in that half hour period, however, when he took off for lunch he was not in the machine room—he was in the makeup room and he did not know how long Mr. Overton had been gone from his machine when he saw him coming from the toilet; that he asked him to call his folks and tell them to come after him, which he did; that Mr. Overton told him he turned sick to his stomach and had vomited; that he thought it must have been about a quarter of 12 when he made the report to Mr. Brooks; *that the regular lunch hour was 12 to 12:30.* That two men carried him out, the night watchman and an operator. That he did not notice that Mr. Overton had been having any struggle on setting type prior to the time he was stricken and that they had had an unusual amount of books in the plant at that time, that at this particular time he was subbing for the foreman and he did his *operating after hours on overtime.* [Italics ours].

"Findings of Fact and Conclusions of Law: After thorough consideration of all the evidence in this case, I find, as a matter of fact, that James Claude Overton was employed by Foote & Davies as a linotype operator at an average weekly wage of $108.12. It was stipulated that his wage was more than $48.00 per week but Mr. Joseph H. Burke, comptroller of Foote & Davies, testified he was making $108.12 per week straight time, and that on August 22nd, 1953, while so employed he suffered an accident and injury which arose out of and in the course of his employment, which was the proximate cause of his death on August 23rd, 1953. That the primary cause of death under the medical evidence was the 'rupture of the aorta, which is the major artery of the body' which was testified to at length and

in detail by Dr. Abner Golden who was present when the autopsy was made of the deceased which was corroborated by Dr. T. E. McGheay, who testified that he treated James Claude Overton on the date indicated in the hospital records, which was his last illness, and that he was a patient at Emory University Hospital and he testified that 'they found a mass in the left abdomen that seemed to pulsate slightly when his heart would beat. That he had ecchymoses, that is blood under the skin around in the left flank and all the way around to the navel in front. That he was in shock, that is low blood pressure and rapid pulse and that was about all the significant findings; that these were enough findings 'to lead them to make a diagnosis of a ruptured abdominal aorta.' The evidence shows that the deceased had been doing some overtime work and he told Dr. McGheay that 'he had been working pretty hard recently and carrying some type things which he wasn't used to carrying,' which evidence was admissible as held in the case of *Whisenant* v. *Bostick*, 61 *Appeals* 447 (3), and I find, as a matter of fact, that the exertion under the employment was too great for a man in the condition of the deceased and in the case of *Williams* v. *Maryland Casualty Company*, 67 *Appeals*, page 649: '1. Where a person who is afflicted with arteriosclerosis and heart disease is engaged at work in a narrow, deep ditch in calking a pipe which necessitates the use, in a cramped and stooped-over position, of a calking hammer to drive the lead around the pipe joints, and such person is suddenly and unexpectedly stricken and dies, it can be said as a matter of law that he died as a result of an accidental injury while engaged in the course of and in the performance of an act connected with his employment. 2. An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work whatever the degree of exertion or the condition of health. 3. A physical impact is not a necessary prerequisite to an "injury" within the compensation act.'

"This rule has been followed consistently by our appellate courts.

"I further find, as a matter of fact, that Mrs. James Claude Overton was the legal wife of the said James Claude Overton and the sole dependent within the provisions of the Workmen's Compensation Act at the time of his death on August 23, 1953, and

that she is entitled to compensation at the rate of $20.40 per week, commencing August 23, 1953, and continuing for a period not to exceed 300 weeks, subject to the provisions of the act and that she is further entitled to a sum not to exceed $225.00 to apply on the funeral expenses of said deceased to be paid to the proper party or parties on proper evidence of same, and she is further entitled to all necessary and reasonable medical expenses incurred as a result of said injury, including hospital and ambulance bills, if any.

"Award: Wherefore, based on the above findings of fact and conclusions of law, Foote & Davies, employer and/or Great American Indemnity Company, insurance carrier, are directed to pay to Mrs. James Claude Overton, claimant, compensation at the rate of $20.40 per week, commencing August 23rd, 1953, and continuing for a period not to exceed 300 weeks, subject to the provisions of the Workmen's Compensation Act, and are further directed to pay a sum not to exceed $225.00 to apply on the funeral expenses of said deceased and are further directed to pay all medical, hospital and ambulance bills incurred as a result of said injury. All accrued compensation, medical and funeral expenses are directed to be paid immediately. And it is so ordered this the 6th day of August, 1954."

Without discussing whether or not the conversations between testifying physicians and the deceased were hearsay, that testimony is not necessary in order to affirm this case. There is other ample competent evidence to support the findings of fact. Any competent evidence to support such findings is sufficient, but in the case at bar there appears ample evidence to support the findings of the State Board of Workmen's Compensation. This holding is not contrary to the ruling in *Liberty Mutual Ins. Co. v. Meeks*, 81 *Ga. App.* 800 (60 S. E. 2d 258), cited by counsel for the defendants. The facts there were different and we are of the opinion that the findings of fact in the instant case were not based on mere conjecture as suggested by counsel for the defendants and as indicated in *U. S. Fidelity &c. Co. v. Brown*, 68 *Ga. App.* 706 (23 S. E. 2d 443). However, in the latter case, quoting from *Lathem v. Hartford Accident &c. Co.*, 60 *Ga. App.* 523 (3 S. E. 2d 916), this court said: "Declarations of a party himself, to whomsoever made, are competent evidence, when

confined strictly to such complaints, expressions and exclamations as furnish evidence of a present existing pain or malady, to prove his condition." Nor is *Aetna Casualty &c. Co.* v. *Chandler,* 61 *Ga. App.* 311 (6 S. E. 2d 142), applicable. There the testimony was different. In the instant case the State Board of Workmen's Compensation had more than an inference on an inference on which to base the findings of fact. As indicated by the evidence set out in the statement of fact of deputy director Chalker, there is sufficient evidence to show that the employee was within the scope of his employment at the time he became disabled.

The court did not err in sustaining the findings of fact and the award of the State Board of Workmen's Compensation based thereon.

*Judgment affirmed. Townsend and Carlisle, JJ., concur.*